**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHEN DISTRICT OF ILLINOIS
WESTERN DIVISION**

| | | |
|---|---|---|
| RICHARD J. JANKOWSKI, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 16-CV-50103 |
| | ) | |
| DEAN FOODS COMPANY, and DEAN | ) | Honorable Judge Frederick J. Kapala |
| DAIRY HOLDINGS, LLC, | ) | |
| | ) | Magistrate Judge Iain D. Johnston |
| Defendants. | ) | |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**Introduction[1]**

In May 2014 the Cook County Circuit Court abruptly reversed an IWCC decision in

Defendant Dean Food's ("Dean") favor with directions to award Plaintiff Richard Jankowski

("Rich") full past workers' compensation ("WC") TTD and other benefits as well as the expense

of a second neck fusion surgery. ¶15. Three and half years of litigation over a 4 and ½ year old

occurrence Dean thought it had won was suddenly lost with the prospect of many more years of

litigation and related risks and expenses ahead. ¶¶15-16. In the wake of such disappointment, just

months later Rich, who had been off work and recovering from the second neck fusion surgery,

was released to return to work ("RTW") and naively asked for his job back. Dkt. #50 ¶¶29-30.

Dean immediately refused and continued to shut Rich out of work for the following 18 months

until his CBA seniority lapsed formally ending his Dean's employment. Dkt. #50 ¶¶31-42. Dean

---

[1] Plaintiff incorporates and cites with appropriate references herein the facts set forth in LR 56.1(a)(3)
Statement of Facts in support of Motion for Partial Summary Judgment (Dkt. #50) filed August 17, 2018,
and LR 56.1(b)(3)(c) Statement of Additional Facts that Require Denial of Summary Judgment to
Defendant filed September 24, 2018, concurrent with this Memorandum. (Dkt. #63).

deviated from its standard procedures[2] to take the first opportunity to retaliate against Rich by denying out-of-hand his repeated requests to RTW without considering, discussing or proposing any accommodation that may have alleviated any legitimate concern it had about his ability to perform his former job or numerous others that were being performed by less senior workers whom he had a collective bargaining agreement ("CBA") right to bump. ¶¶17-22; Dkt. #50 ¶59. Meanwhile, in some cases near simultaneously, Dean posted at least 14 open jobs that Rich could do with or without slight accommodations and filled them with less senior workers without simply notifying Rich. Dkt. #50 ¶¶43-58.

The evidence shows that Rich's request to RTW prompted Dean to begin a slow, prolonged process of feigning required CBA grievance meetings that lasted minutes and accomplished nothing, while dissembling to create a job "questionnaire" specifically for Rich complete with inaccurate, staged photos of a supervisor Randy Lentz unnecessarily stretching up and over the side of a machine in one, and not using a ladder that is in place and normally used in another as he reaches full extension above head for another machine. ¶¶17-22, 32, 35, 42. This sham was not the first time Dean intentionally discriminated/retaliated against Rich. The evidence also shows that Dean had a 100% healed policy it applied against Rich in October 2009 when several of Rich's supervisors, including Lentz and decision-maker Greg Warren knowingly demanded that Rich perform work outside his medical restrictions immediately following his report of a work injury they openly doubted and labeled "pre-existng," and then demanded that he be 100% healed in order to work, or go home without pay until he could. ¶¶4-11, 48-49.

---

[2] The evidence shows it was Dean's standard practice to send workers to fitness-for-duty and/or functional capacity exams and send the doctor's a formal, written job description in order to determine whether a worker was able to perform a job. Dean not only refused to send Rich to any such exam, it chose to withhold these standard job descriptions from discovery in this case. ¶¶15, 43, 50-58. This evidence in and of itself creates a GIMF for a jury to decide.

This and other evidence creates numerous genuine issues of material fact ("GIsMF") that cannot be resolved on summary judgment including a GIMF regarding causation on Rich's workers' comp retaliation claims and numerous GIsMF on his ADA claims including whether Rich was "qualified" to perform the essential functions of one or more of these open positions with or without accommodation, what were "essential functions" of such positions, whether Dean failed to engage in the ADA-mandated interactive process, and whether Dean failed to provide reasonable accommodation that would have allowed Rich to perform the true essential functions of one or more of these jobs. This Court should accordingly deny Dean's MSJ.

## Argument

### I.    Summary Judgment Standard

In deciding Dean's MSJ, this Court views all facts and make all reasonable inferences in Rich's favor. *Johnson v. Advocate Health & Hosp. Corp.,* 892 F.3d 887, 893 (7th Cir. 2018). The 7th Circuit continues to stress that "a court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts" on summary judgment, and must "avoid[] the temptation to decide which party's version of the facts is more likely true." Id. (internal quotations omitted). In fact intensive ADA and retaliation cases like this one, this can be a difficult task. *Rowlands v. UPS*, 2018 U.S. App. LEXIS 24016, *11-12 (7th Cir. Aug. 24, 2018) (summary judgment reversed on ADA failure to accommodate and retaliation claims). 3

---

3 In retaliatory discharge cases the employer's intent is the critical issue. *Dixon Distributing Co. v. Hanover Ins. Co.*, 244 Ill. App. 3d 837 (5th Dist. 1993), aff'd,161 Ill. 2d 433 (1994). "When deciding the element of causation, the ultimate issue is the employer's motive in discharging the employee." *Michael v. Precision Alliance Grp., LLC*, 2014 IL 117376, ¶ 31, (2014), citing *Clemons v. Mechanical Devices Co.*, 184 Ill. 2d 328, 336 (1998). "[R]etaliatory discharge may be established by circumstantial evidence; consequently, the issue of causation is usually not appropriate for summary judgment." *Good v. CPI Corp.*, 2012 U.S. Dist. LEXIS 133233, *14-15 (S.D. Ill. Sept.18, 2012) (J. Reagan) (denying defendant's summary judgment motion on state workers' comp retaliatory discharge claim); *Zuccolo v. Hannah Marine Corp.*, 387 Ill. App. 3d 561, 568-69 (1st Dist. 2008) (the question of whether there is a causal connection to an employee's discharge or whether an employee was discharged for a valid, nonpretextual

## II. A Jury Must Decide Numerous GIsMF as to Richard's Illinois Workers' Compensation Act and Common Law Retaliation Claims.

### A. Deans has not moved for summary judgment on Richard's retaliatory refusal to recall claim.

The IWCA and Illinois common law prohibit retaliatory refusal to rehire or recall to active service in a suitable capacity as well as retaliatory discharge. See 820 ILCS § 305/4(h); see also *Motsch v. Pine Roofing Co.*, 178 Ill. App. 3d 169, 175 (1st Dist. 1988). Richard plainly alleged that Dean's retaliated against him by refusing to return him to work from August 2014 to the February 2016 discharge because of his protected IWCA activities. Dkt. #15, ¶¶79-80. It is well settled that plaintiffs in federal court are not required to plead legal theories. *Hatmaker v. Mem'l Med. Ctr.*, 619 F.3d 741, 743 (7th Cir, 2010) (district court erred in ruling plaintiff waived her "participation" retaliation theory by not mentioning it in the complaint); *Reeves v. Jewel Food Stores, Inc.*, 759 F.3d 698, 701 (7th Cir, 2014) (ADA failure to accommodate claim not waive even though not mentioned in complaint where supporting facts were alleged). Rich also plainly told Dean in his interrogatory answers that its refusal to return him to work was retaliation for his IWCA-protected activities. ¶3. Dean has been well aware of this claim; yet, has not moved for summary judgment on it.

Additionally, Dean's central argument in support of summary judgment on Rich's retaliatory discharge claim, i.e., that it discharged Rich due to a neutral application of CBA 60-month lapse in seniority rule, is completely negated if Rich prevails on his retaliatory refusal to recall claim. If Dean recalled Rich prior to the lapse of his seniority rights, the lapse of course would not have occurred and he would not have been discharged. See *Baptist v. Ford Motor Co.*, 827 F.3d 599, 601-02 (7th Cir. 2016) (summary judgment reversed where defendant's claimed legitimate reason for firing plaintiff, i.e., his absenteeism, is factually bound up with the parties'

reason is usually not ripe for a summary judgment).

dispute over whether he was physically able to drive a forklift). The impact of Dean's failure to move for summary judgment on Rich's retaliatory refusal to recall claim is brought home by the clear Illinois case law holding that in addition to constituting a separate, stand-alone retaliation claim, an employer's failure to rehire or recall an employee after he engaged in IWCA protected activity is evidence of retaliatory animus and willfulness. See *Motsch*, 178 Ill. App. at 169; see also *Heldenbrand v. Roadmaster Corp.*, 277 Ill. App. 3d 664, 673 (5th Dist. 1996) (affirming trial court's determination following a bench trial that plaintiff produced sufficient evidence of causal connection to support his workers' comp retaliatory discharge claim, one piece of which was the employer hiring 600 new employees while rejecting plaintiff's applications for rehire.).

In *Hugo v. Tomasewski,* 155 Ill. App. 3d 906, 909-12 (5th Dist. 1987), the court reversed summary judgment to defendant based on plaintiff's circumstantial case that raised a triable inference of causation, including evidence similar to Rich's here (Dkt. #50, ¶¶43-61) (¶¶15-20), that while plaintiff had 23 years of experience, defendant fired him and then hired a replacement worker for an open position without asking plaintiff to fill the opening. "We agree that defendant's failure to contact plaintiff regarding the next available opening at the store after his discharge supports an inference that plaintiff was discharged for a reason other than a decline in business." Id. at 910-11; see also *Jones v. Burkardt Foam, Inc.*, 231 Ill. App. 3d 500, 503-04 (5th Dist. 1992) (reversing summary judgment to employer on WC retaliatory discharge claim where defendant refused to rehire plaintiff even when confronted with evidence that plaintiff was actually not released to work on the days in question, placed defendant's professed motive for the underlying discharge, no call no show for 3 days, in doubt). Accordingly, without judgment on Rich's failure to recall claim, Dean cannot have judgment on the retaliatory discharge claim.

**B.** **_A GIMF exists as to whether Dean's refusal to recall Richard and consequent discharge were causally related to his protected IWCA activity._**

To survive summary judgment, Rich is required to present evidence to establish a GIMF that Dean's refusal to recall and discharge was causally related to his exercise of IWCA rights.[4] _Roger v. Yellow Freight Systems, Inc._, 21 F.3d 146, 149 (7th Cir. 1994); _Clemons v. Mechanical Devices Co._, 184 Ill. 2d 328, 335-36. If the employer offers an alleged legitimate reason for the discharge, the employee still can prevail by presenting evidence from which a reasonable jury could disbelieve it. _Michael v. Precision Alliance Grp., LLC_, 2014 IL 117376, ¶¶ 36-39, (2014).

First, the reason offered by Dean (medical inability to work) is not legitimate because it violated the ADA, as shown below. The numerous GIsMF on the ADA failure to accommodate claim also preclude summary judgment on work comp retaliation claim. A jury has to decide the key disputed issues of what the essential functions of these jobs were and whether Rich could do them. A jury needs to assess what the evidence can reasonably be interpreted as false and phony documents (i.e., the "questionnaire" and photos of Lentz) that Dean created specifically to keep Rich out of work and cover its true retaliatory intent. ¶¶17-22, 32, 35, 42. The testimony from Brandon Marvin, Dean's EHS Manager at the time, is that detailed job descriptions existed (at least through to his departure in late 2015) and were used to communicate with doctors; yet, Dean has not produced them. ¶¶17, 43-44. Such irregular and missing key documents preclude summary judgment. _Baines v. Walgreen Co._, 863 F.3d 656, 664-65 (7th Cir 2017) (summary

---

[4] Rich does not need to show that the exercise of his IWCA rights was the "only cause," or "the last or nearest cause." See IPI No. 15.01, Proximate Cause—Definition. He is required to show it was a proximate cause. Id.; see also _Holland v. Schwan's Home Serv., Inc._, 2013 IL App (5th) 110560, ¶¶142-151 (approving the "short form" of IPI 15.01 in a workers' compensation retaliation case). Put another way, the reason for refusal to rehire/discharge must be "wholly unrelated to" Richard's protected IWCA activities. See _Clark v. Owens-Brockway Glass Container_, 297 Ill. App. 3d 694, 698 (5th Dist. 1998). Dean's incorrectly contends the causation standard is "primarily in retaliation" for exercising IWCA rights. Under either standard, the wealth of evidence creates a GIMF regarding causation.

judgment for employer on retaliatory fail to rehire claim reversed in part based key missing records). Mr. Marvin also testified that Dean had a practice of working with restricted workers and their doctors to return them to work but it was not followed for Rich solely because of the ongoing workers' comp litigation is direct evidence of illegal retaliatory motive.[5] ¶¶17, 43, 50-58. *Rhodes v. Ill. Dept. of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004) ("Direct evidence is evidence that, if believed by the trier of fact, would prove discriminatory conduct on the part of the employer without reliance on inference or presumption.").

Additional strong evidence of retaliatory motive is the largely uncontested evidence that decision maker Warren and other supervisors immediately and repeatedly doubted and challenged the legitimacy of Rich's injury (injury was "pre-existing") and ordered and pressured him to push bossies in direct contravention of his doctor's note. ¶¶4-11. On October 10, 14 and 15, at least 3 of Rich's supervisors, fully aware of his doctor's restrictions, ordered him to push loaded bossies under threat of being sent home. Id. Rich was told that if he could not push full bossies he would have to go home without pay and could not return to work until he was able to work full duty. Id. They also continually stated/concluded that Rich's pain was from a "pre-existing condition." Lentz and another supervisor told Rich that his doctor's note did not count because his condition was "pre-existing." Id. Warren (then Plant Manager) told Rich could not do the job 100%, he would have to go home without pay until he could. Id. ¶9. Under such pressure and intimidation, Rich tried to push fully loaded bossies against his restrictions until he could no longer take the pain and left work early. Id. This evidence shows Dean's complete and knowing disregard of Rich's rights and its obligations under the ADA and Illinois law because of the ongoing, years-long workers' compensation litigation and Rich's permanent work restrictions. See

---

[5] If not direct evidence, it is very strong circumstantial evidence of illegal motive and pretext. *Baines v. Walgreen Co.*, 863 F.3d 656, 664-65 (7th Cir 2017) (summary judgment for employer on retaliatory fail to rehire claim reversed in part based on deviation from normal hiring policy).

*Netzel v. United Parcel Service, Inc.*, 181 Ill. App. 3d 808, 813-14 (1st Dist. 1989) (affirming a jury verdict for plaintiff in IWCA retaliatory discharge based on evidence that the officer who fired the employee had earlier told the employee that his injury was "a bunch of crap" and "bullshit"); *O'Rourke v. Roadway Express, Inc.*, 2000 U.S. Dist. LEXIS 12313, *18-22 (N.D. Ill. Aug. 21, 2000) (J. Reinhard) (summary judgment denied where supervisor involved in termination had earlier called a liar and a fraud and his doctors "quacks"; such statements were direct evidence of retaliatory motive); *Holland v. Schwan's Home Service, Inc.*, 2013 IL App (5th) 110560, P228-239 (5th Dist. 2013) (affirming significant jury compensatory and punitive damages awards in a work comp retaliatory discharge case where defendants coerced plaintiff to work beyond his medical restrictions); *Siekierka v. United Steel Deck, Inc.*, 373 Ill. App. 3d 214, 221-22 (3d Dist. 2007) (illegal to coerce plaintiff to forego or compromise his rights to work comp benefits through pressure to work beyond medical restrictions); *Brooks v. Pactiv Corp.*, 729 F.3d 758, 768 (7th Cir. 2013) (same) (following *Clemons* and *Siekierka*: "Nevertheless, an employer that presents 'an arguably valid basis for firing an employee, . . . may still be liable for retaliatory discharge if the actual motivation for the termination was the employee's pursuit of a workers' compensation claim.'").

Additionally, from this evidence alone the Court can and should summarily reject Dean's premature contention that punitive damages are not warranted as a matter of law. See *Holland v. Schwan's Home Serv., Inc.*, 2013 IL App (5th) 110560, P229-245 (2013) (affirming $3.6 million punitive damages award based largely on evidence that plaintiff's supervisors ignored his work restrictions, forced him to work beyond them, and played doctor); *Lampley v. Onyx Acceptance Corp.*, 340 F.3d 478, 483 (7th Cir., 2003) (evidence of a sham investigation is enough to allow a jury to rule on punitive damages).

Next, and of critical importance, is the fact that Deans' was on the losing end of the years-long WC battle WC with Rich all during the time that it was baselessly refusing his

requests that it comply with the CBA and the ADA, and return him to work (i.e., August 2014 to his February 2016 termination). ¶¶15-16. In May 2014, just months before Rich was released to RTW and Dean began to deny his requests to RTW, the Cook County Circuit Court reversed the IWCC decision in Dean's favor with directions for the IWCC to award him TTD benefits from February 2011 to January 2013, and found that the fusion surgery recommended by Dr. McNally was reasonable and ordered Dean to pay for it. Id. Dean then filed an action for administrative review in the Cook County Circuit Court. In March 2015, the Circuit Court entered an order confirming the IWCC's decision in Richard's favor. Id. This evidence and timeline is undisputed and shows that Dean by and through decision-makers Spadoni and Warren jumped all over the first opportunity to retaliate against Richard when he was released to RTW in August 2014, just months after Dean's work comp victory had been abruptly reversed. See *Baines*, 863 F.3d at 666 (7th Cir. 2017) ("Because Baines had not worked at Walgreens since 2008, her 2014 application was Walgreens' first opportunity to retaliate for her 2009 EEOC charge."); *McGuire v. City of Springfield*, 280 F.3d 794 at 796 (7th Cir. 2002) (adverse action could be retaliatory even though it followed protected activity by ten years because it was the employer's first opportunity to retaliate).

Dean's arguments are misplaced and/or do not address the evidence.[6] At most they create GIsMF that must be decided by a jury. Dean's erroneous attempt to limit Rich's IWCA protected activity to his December 2010 filing of a formal clam at the IWCC is contrary to well-

---

[6] The evidence does show retaliation by decision-makers Spadoni and Warren in 2007 while Rich's prior WC claims were pending. ¶58. Also, Dean did not dispute the work relatedness of those injuries. Rich of course does not have to prove that Dean retaliated against all, or any other workers' comp claimants. An employer may not avoid liability merely because it treats some members of the protected class favorably. *Connecticut v. Teal*, 457 U.S. 440 (1982); *Diaz v. Kraft*, 653 F.3d 582, 588 (7th Cir. 2011) ("the employer cannot satisfy its burden by identifying a person within the protected class who was not similarly discriminated against"). Dean is welcome to produce a WC claimant who fought them with success for years, and whom Dean allowed to return to work with permanent restrictions. Dean has allowed at least 2 non-WC claimants with years-long restrictions to RTW. ¶¶49, 51-57.

established law. Rich's IWCA protected activity began in October 2009 when he was injured at work, reported the work injury to Deans, received medical treatment, submitted related work restrictions, and then complained when his bosses ordered him to work beyond such restrictions on threat of being sent home. See *Gordon v. Fedex Freight, Inc.,* 674 F.3d 769, 773-74 (7th Cir. Ill. 2012) (under *Hinthorn v. Roland's of Bloomington*, 119 Ill. 2d 526, 533-34 (Ill. 1988), "…an employee exercises a right under the IWCA merely by requesting and seeking medical attention."); *Gacek v. Am. Airlines, Inc.,* 614 F.3d 298, 299 (7th Cir. Ill. 2010) (holding that a discharge motivated by an injury report is a retaliatory discharge under Illinois workers' compensation law even if the employee does not file a claim until years later).

Overall, from the evidence considered in the light most favorable to Rich a reasonable jury (1) could disbelieve Dean's alleged legitimate reason (i.e., medical inability to work) for refusing to recall Rich to work, and (2) could find that such reason was not legitimate because it violated the ADA. *Herman v. Power Maint. & Constructors, LLC*, 388 Ill. App. 3d 352, 364 (4th Dist. 2009) (reversing summary judgment for defendant on work comp retaliation claim where plaintiff produced positive performance evaluations to rebut defendant's alleged unsatisfactory job performance reason for not recalling him).

## II. A Jury Must Decide Numerous GIsMF as to Rich's ADA Discriminatory Failure to Accommodate Claim.

### A. *Rich was and continues to be "disabled" under the ADA as a matter of law.*

As he argued and supported with evidence and applicable law in his MSJ (Dkt. #s 49-52), Rich has been substantially limited in the MLA of lifting since October 2009. Since that date and continuing to date, he has been medically restricted from lifting > 25 lbs. floor to waist, and from pushing/pulling > 50 lbs. At times in 2010, the limits were lowered to 10-15 lbs./35 lbs., and a no repetitive grabbing restriction as added. Dkt. #50 ¶¶19-24. The lifting restrictions were made

permanent in July 2010 and were reinstated as permanent in August 2014 when Richard was released to RTW following his second neck fusion surgery. Dkt. #50 ¶¶23-24, 29.

**B.** *Rich did not "admit" that his medical restrictions did not substantially limit his major life activities.*

It is not contested that Dean has been on notice and well aware of Rich's permanent work restrictions since August 2014. It does dispute the restrictions and in fact alleges it relied on them in refusing to return Rich to work. Dean has also been well aware since Rich filed his EEOC charge in February 2015 that Rich claimed he was disabled under the ADA (i.e., that he was significantly restricted in his ability to perform one or more major life activities). Dkt. #1, p. 11. At his deposition, Dean's counsel did not simply ask Rich whether he was limited in a major life activity and if so which one. Counsel instead chose to badger Rich about whether he can have sex with his wife. Dkt. #56, ¶4. At his deposition, Rich in fact testified consistent with his EEOC charge and claims in this lawsuit that since August 2014 he has been substantially limited in the major life activities of lifting and working[7]. ¶3. Accordingly, there is no testimony by Rich that could possibly serve as a binding judicial admission on this issue as there was in the cases cited by Dean. See *Castro v. DeVry Univ., Inc.*, 786 F.3d 559, 572 (7th Cir. 2015) (deposition testimony must constitute "clear answers to unambiguous questions which negate the existence of any genuine issue of material fact" before it can be deemed "binding").

**C.** *A GIMF exists as to whether Richard is a "qualified" individual under the ADA.*

A "qualified individual" under the ADA is "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). The ADA defines the term "reasonable

---

[7] As argued and supported in his Motion for Partial Summary Judgment and related materials (Dkt. #s 49-50), Richard was substantially limited in the MLA of lifting. He therefore does not have to prove he was also substantially limited in any other MLAs including working in order to prevail on his ADA claims.

accommodation" to include job restructuring, reassignment to a vacant position, and acquisition or modification of equipment or devices, and other similar accommodations for individuals with disabilities." 42 U.S.C. § 12111(9). Here, the conflicting evidence creates a GIsMF regarding (1) whether and to what extent certain tasks were required to be done, how they could be done and whether these tasks and others were "essential functions" ("EFs") of Rich's former job as operator in the EC room or any other of the 14 Filler room or Filler/Uniloy room relief positions that were and/or became vacant, and (2) whether Rich could have satisfactorily performed the essential functions of these jobs with or without reasonable accommodation.

Deans has the burden to show that a particular job function was essential. *Rehrs v. Iams Co.*, 486 F.3d 353, 356 (8th Cir. 2007); see also 29 C.F.R. pt. 1630, App. § 1630.2(n) (while "the inquiry into essential functions is not intended to second guess an employer's business judgment with regard to production standards," the employer "will have to show that it actually imposes such requirements on its employees in fact, and not simply on paper"). The EF inquiry is a factual question, not a question of law. *Brown v. Smith*, 827 F.3d 609, 613-15 (7th Cir. 2016) (affirming an ADA discrimination/ failure to accommodate jury verdict for the plaintiff who worked for a municipal transit system in part finding ample evidence in support of the jury's conclusion that having a CDL was not an essential function of his street supervisor job even though defendant's job description listed a CDL as essential.)

Rich presents compelling evidence supporting most of the issues/factors relevant to the EFs determination,[8] while Dean relies solely on evidence as to only one of the factors, i.e., employer's judgment. See *Miller v. Ill. DOT*, 643 F.3d 190, 197-200 (7th Cir. 2011) (employer

---

8 (i) The employer's judgment as to which functions are essential; (ii) written job descriptions prepared before advertising or interviewing applicants for the job; (iii) the amount of time spent on the job performing the function; (iv) the consequences of not requiring the incumbent to perform the function; (v) the terms of a collective bargaining agreement; (vi) the work experience of past incumbents in the job; and/or (vii) the current work experience of incumbents in similar jobs. See 29 C.F.R. § 1630.2(n)(3).

judgment important but not controlling); *Brown*, 827 F.3d at 613-15 (employer judgment factor of limited value where (as here) there were other employees available who could perform the alleged EF). Moreover, Dean's "employer judgment" evidence is from Greg Warren (with assist to George Spadoni), i.e., the decision-makers who harbored animus toward Rich.  Further, the centerpiece of such evidence, i.e., a spread sheet and cherry picked/purposely misleading descriptions and sham, staged photos of alleged jobs duties, were only created by Spadoni and Warren after Rich was released to RTW and started asking to RTW—it's first opportunity after learning just months earlier that its workers' comp victory had been reversed and it was looking at years more litigation against and because of Rich. ¶¶15-22, 32, 35, 42.

As explained above, Dean's claim that it had no written job descriptions for the positions in questions is disputed by its former EHS Manager Brandon Marvin who testified there were formal job descriptions and he sent them to doctors as part of his job trying to find work for restricted workers.  ¶43. Marvin testified that he made no such efforts for Rich only because Dean disputed Rich's work comp claim and there was ongoing litigation. ¶¶17, 50-58. This creates a triable GIMF in and of itself.  Be that as it may, the documents Dean created and choose to produce in this matter are not the neutral "prepared for advertising or interviewing applicants" called for in the ADA regulations. A jury needs to hear and weigh the evidence and decide this GIMF.

Next, Dean has produced no evidence showing how much time workers spend on the alleged EFs, another relevant factor. ¶¶44-47; Dkt. #50 ¶8. Dean does not record which operator performs which function or other metrics of how the work gets done, by whom, or how long it takes them. ¶¶12, 24, 28, 33, 35-37. The operators work as a team and rotate though various positions to accomplish the common goal. ¶¶33, 40; Dkt. #50 ¶¶8-9. They help each other for

various reasons, with various tasks, at various times within their discretion. Dean does not

prohibit such assistance and does not measure it. Id. Dean does not keep and/or has produced

production rate information. Id. Dean did not know how Rich was able to do his former Empty

Case room job within his restrictions; it did not ask. ¶10.

Perhaps the most telling relevant factors is "work experience of past incumbents in the

job." Id. §§ 1630.2(n)(3)(vi). Rich is an "incumbent" in the Empty Case room. He worked in it

steady and with no complaints of unsatisfactory performance for nearly 7 years, the last year and

½ with comparable restrictions that Dean accommodated by allowing Rich stay in his regular

position and self-manage methods to accomplish the duties within his restrictions. ¶¶2, 12-14;

Dkt. #50 ¶19. This was not a light duty or temporary position. Id. It was his regular job. Id. There

is no evidence that Dean incurred any hardship let alone undue hardship from providing such

accommodation. Id.  Dean did not monitor or record which specific job duties Richard performed

on any given day, how he performed them, or whether there was any effect on production rate,

safety or any of the other metrics that Dean now claims prevented it from returning Rich to work

after his August 2014 release. Id. Dean's claim of good faith compliance with the ADA's IP

mandate is severely undercut by the fact that it did not simply ask Rich how he was able to

perform his EC room duties within his restrictions during this time period. Id. HR Mgr. Spadoni

did not even check to see what restrictions Richard was under, and did not inform himself of how

Richard was able to perform his ECR operator duties during this time period. Id. On this

evidence alone, a jury could find that Dean violated its ADA IP duties.

Rich's testimony that he can and did perform the EFs of the Empty Case room within his

restrictions is buttressed by Greg Munks, a veteran operator for Dean including 7 years as a

foreman in the EC room. ¶29. Munks reviewed Richard's August 2014 permanent restrictions

and believed that he could "definitely" do the job. Id. James Steele is a 25-veteran operator for Dean including the last18 years as an operator in the Uniloy room. ¶59. He is aware of Rich's permanent restrictions and believes that Rich can perform the essential functions of the operator job in the Uniloy room utilizing the various methods and accommodations noted above without violating his medical restrictions, requiring his duties to be reassigned to another operator, creating a safety hazard, or having a noticeable impact on productivity. ¶59. Rich also worked in the Uniloy and Filler rooms for significant time during his first years on the job. His first-hand experience and testimony as to what the EFs are and that he can perform them with slight accommodations deserves to be credited every bit as Mr. Warren's, and in itself can be sufficient to create a GIMF and defeat summary judgment. *Hill v. Tangherlini,* 724 F.3d 965, 967-68 n. 1 (7th Cir. 2013).

Dean simply misrepresents the record by stating Rich's restrictions were temporary. It is undisputed that Dean's own doctor made the restrictions permanent in July 2010 and Rich worked the following 7 months in the EC room with permanent restrictions as limiting or more limiting than his August 2014 restrictions. Dkt. #50 ¶¶8-9; ¶¶2, 12-14. Dean also oversteps in stating it granted him "light" duty from October 200 to February 2011.  Dean clearly stated in interrogatory answers that Rich was on "transitional" duty in his regular position, and it did not know what duties he was performing or how he was managing to perform them within his restrictions. . ¶12. Dean has no evidence that it formally excused any EC room duties (because it did not). Dean also provides no evidence to support its claim that Rich was unable to perform "certain" EFs of the EC room because of his lifting restrictions (Dkt. #55, p. 9).  It does not identify any such functions. Rich performed all Empty Case room duties with slight self-managed accommodations within his restrictions and without Dean even knowing (or caring) –

i.e., without hardship to Dean.  Returning him to the EC room in August 2014 therefore was a reasonable accommodation.  See *Van Buskirk v. City of Indianapolis/Indianapolis Fire Dep't*, 2004 U.S. Dist. LEXIS 19589, 1-34 (S.D. Ind. May 12, 2004) (denying summary judgment and rejecting defendant's claim that passing a typing test was an EF of plaintiff's dispatcher job where  plaintiff had been competently doing his job for years – "the strongest evidence that he is able to perform the essential functions of the job"). The evidence shows that he had a right to bump one or more less senior workers.  ¶31. Additionally, providing an accommodation to an employee, or excusing an employee from performing some job function in the past, as Dean indisputably did here for Rich, is evidence showing that the function is not essential. *EEOC v. Sharp Mfg. Co.,* 534 F. Supp.2d 797, 807 (W.D. Tenn. 2008) (standing was not essential because plaintiff did the job seated for a long time, and rotation could have been limited to seated positions).

    *Miller v. IDOT* is directly on point and refutes Dean's arguments here. In a similar team work environment, the *Miller* court reversed summary judgment for IDOT finding a GIMF as to whether working above 25 feet in extreme or exposed position was an EF of Miller's position as a highway maintainer on the bridge crew. *Miller*, 643 F.3d at 197-200 (7th Cir. 201) The evidence showed that the bridge crew worked as a team, IDOT did to assign permanent tasks to any one member, individual members did various tasks as needed according to their capacities and abilities, it was not necessary for any one member of the bridge crew to be able to do every task of the bridge crew as a whole. Id. The court concluded that while some high work in exposed or extreme positions was an EF of the bridge crew as a whole, not every task required of the bridge crew as a whole was an EF of each bridge crew member. Id. Also on point and supporting denial of Dean's MSJ here, is *Crain v. Roseville Rehab. & Health Care*, 2017 U.S.

16

Dist. LEXIS 40162 *4-6, 11-15 (N.D. Ill. March 21, 2017) (J. Darrow) (GIMF whether is was essential for permanently lifting restricted CNA to lift, carry, push/pull weights in excess of her limits).

### A. A GIMF exists whether Dean failed to reasonably accommodate Richard's disability.

The ADA imposes an affirmative duty on employers to make reasonable accommodations for the disabilities of an employee who can perform the essential functions of her job with or without accommodation. 42 U.S.C. §§ 12112(b)(5)-(7). Employers do not have "unfettered discretion to decide what is reasonable. The law requires an employer to rethink its preferred practices or established methods of operation. Employers must, at a minimum, consider possible modifications of jobs, processes, or tasks so as to allow an employee with a disability to work, even where established practices or methods seem to be the most efficient or serve otherwise legitimate purposes in the workplace." *Miller*, 643 F.3d at 199 ("From this same evidence, a reasonable jury could find that Miller's request for accommodation—that other members of his team substitute for him when a task required working above 25 feet in an exposed or extreme position—was reasonable"); see also *Vande Zande v. State of Wisconsin Dep't of Administration*, 44 F.3d 538, 542 (7th Cir. 1995) ("It is plain enough what 'accommodation' means. The employer must be willing to consider making changes in its ordinary work rules, facilities, terms, and conditions in order to enable a disabled individual to work."). "The employer must first identify the full range of alternative positions for which the individual satisfies the employer's legitimate, nondiscriminatory prerequisites . . . and then determine whether the employee's own knowledge, skills, and abilities would enable her to perform the essential functions of any of those alternative positions, with or without reasonable accommodations." *Dalton v. Subaru-Isuzu Auto., Inc.,* 141 F.3d 667, 678 (7th Cir. 1998). Dean's

argument that Rich didn't apply for a job, or was required to submit a "specific work adjustment" are contrary to this well-established law. See Hendricks v.

Here, the wealth of evidence as detailed above shows that a jury could reasonably find that Rich was able to perform the EFs of the operator position in the Empty Case, Uniloy and Filler rooms with slight to no accommodations. ¶¶23-42. The evidence further shows that Dean filled at least 14 open positions in the Filler, Uniloy and/or relief in those rooms, one of which was on the very day that it received Rich's release to RTW, another later that month and still another as the supposed "interactive" grievance meetings came and went. Dkt. #50 ¶¶43-45. These were regular jobs; not temporary and certainly not "light duty." Dean's argument and cases about not being obligated to put Rich in a "permanent light duty" job have no application here. Similarly, there was no need to "reassign" duties to other workers as Dean incorrectly contends. The evidence shows that the only EFs that Rich may have needed assistance with was moving deformed plastic or "slag" that weighed over 25 lbs. in the Uniloy room, and possibly moving the lid to one of the Fillers to clean it. 18-year veteran Uniloy operator Jim Steele testified that such heavy pieces of slag occur once a year on average, and operators help each other move them with forklifts and carts, if necessary.

Rather than simply placing Rich back into his prior job in the empty case/wire room,[9] or implement relatively easy and inexpensive adjustments to one of the 14 positions that became open, the evidence shows that Deans created an inaccurate job "questionnaire," hid its job descriptions, staged inaccurate photos and provided inaccurate information to the union, to Rich

_____

[9] Rich's right to bump less senior workers under the CBA effectively "opens" all positions filled by less senior workers in the Empty Case, Uniloy and Filler rooms. Dkt. #50, ¶59. In addition to the 14 identified open positions, there were 2 less senior workers in the Empty Case, and another 4 in the Uniloy. ¶¶31, 38. Rich had a right to bump these less senior workers, just as Dean allowed Steve Diaz to bump Rich from the Empty Case room when he returned from leave due to a non-work related injury in 2012. ¶¶55. Dean failed to notify Rich of these "bump" opportunities.

and to its own expert. ¶¶32 This evidence shows Dean defaulted on its ADA obligations. See *Bultemeyer v. Fort Wayne Comm. Sch.*, 100 F.3d 1281, 1286 (7th Cir. 1996) (employer should have sought an explanation from the doctor if it had concerns with the employee's medical diagnosis). It instead "turned a blind" eye to the ADA process and charged ahead to allow Rich to wallow without a job with time running out on his seniority rights. *Lawler v. Peoria Sch. Dist. No. 150*, 837 F. 3d 779 (7th Cir. 2016) (the school district simply sat on its hands instead of following-up with Lawler or asking for more information); *EEOC v. Sears, Roebuck & Co.*, 417 F.3d 789, 803-04 (7th Cir. 2005) ("[A]n employer cannot shield itself from liability by choosing not to follow up on an employee's requests for assistance, or by intentionally remaining in the dark."); *Vicich v. Walgreen Co.*, 2012 U.S. Dist. LEXIS 157228, *26-29 (N.D. Ill. Nov. 2, 2012) (J. Kennelly) (denying ER SJ on ADA accommodation claim because a reasonable jury could find that defendant failed to engage in the interactive process required by the ADA and the sole accommodation it offered was unreasonable; plaintiff testified that the supervisor never offered her the opportunity to work a "floater" shift every other week to ensure that she would not lose pay, and was hostile in response to her accommodation request and presented her with a take-it-or-leave-it accommodation proposal).

### B. A GIMF exists as to whether Dean reasonably and in good faith engaged in the ADA-mandated Interactive Process.

The ADA also required Dean to engage in an interactive process to identify the "precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations." 29 C.F.R. § 1630.2(o)(3); *EEOC v. Sears, Roebuck & Co.*, 417 F.3d 789, 805 (7th Cir. 2005); *Dalton*, supra. The evidence of bad faith and dissembling discussed above shows that Dean failed to engage reasonably or in good faith with Rich. It did not engage

with Rich at all. The unnecessary HIPAA release[10] is just one more piece of evidence showing

that Dean's real motive was to "interact" with its counsel in order to devise ways to frustrate  and

prevent any meaningful communication with Rich or the union to accommodate his permeant

restrictions. ¶¶18-22. All Dean did was "interact" with its counsel and  attend required CBA

grievance meetings where it failed and refused to discuss possible accommodations under the

pretext of an unnecessary HIPPA release. Id. In addition to being legally unnecessary, Richard

had handed a copy of his restrictions to his union reps and discussed them with his union reps

before the meeting started and in the presence of Spadoni. ¶20. The meetings were ostensibly

being held to discuss Richard's grievance that Dean violated the CBA by refusing to return him

to work within his restrictions. Dean had ready access to all of Richard's medical information.

Nothing prevented Dean from placing Richard back to work in the open Uniloy/Filler relief

position that came open the very day he sent in his release/request to RTW (i.e., August 7) or the

one that came open later that month, or sending Rich to an FCE/FFD exam and providing that

professional with applicable job descriptions. Dean posted these jobs internally, not publicly, and

did not simply notify Richard of them. ¶18. The evidence shows that the only thing preventing

Dean from contacting Rich and taking other reasonable steps to determine what accommodations

would allow him work and in fact returning him to work was discriminatory/retaliatory animus

from the ongoing years-long work comp litigation which Dean had just found out its IWCC

victory was reverse and Richard had prevailed.

---

[10] Dean is not a "covered entity" for purposes of the HIPAA privacy rule. See 42 U.S.C. § 1320d-1(a)(3)
(2000). The application of HIPAA's privacy rule is likewise limited to health plans, health care
clearinghouses, and qualified health care providers, each of which is defined as a "covered entity." 45
C.F.R. §§ 160.102(a), 160.103 (2002). Even if it were, (1) Richard's medical restrictions in the hands of
his employer Dean are excluded from the definition of protected PHI covered by HIPAA's privacy rule
(45 C.F.R. § 160.103) and (2) HIPAA would not require Dean to get written consent form Richard before
it disclosed Richard's medical information to Richard, or his union reps, his sole and exclusive
representative authorized under the CBA (45 C.F.R. § 164.502(a)(2).

There are not many cases with evidence of such egregious and intentional sandbagging and subterfuge.[11] *Hendricks-Robinson v. Excel, Inc.*, 154 F.3d 685, 699-700 (7th Cir 1998) is instructive from the perspective that the court found an issue of fact on the IP issue where plaintiffs were automatically bid for all open jobs in the plant and defendant had a paper policy of meeting with injured workers and discussing restrictions and possible accommodations. The reality, as plaintiffs claimed, was that they were not notified of which jobs were open, could not come into the plant, when they called were told there were no jobs despite fact they were most senior bidders. The *Hendricks'* plaintiffs at least got a chance to bid. Here, Rich was locked out and the key was tossed into the vacuum of a contrived HIPAA release and other fake documents.

Dean's reliance on *Hoppe v. Lewis Univ.* is unavailing because defendant there sent plaintiff doctor's 2 letters requesting clarification of a vague suggestion that her office be relocated due to her condition. Defendant requested more information as to where might be a suitable location for her office and what stressors she should avoid. Neither plaintiff nor her doctor responded. Here, there was no information that Richard withheld from Dean. Even if Dean is to be believed that Rich somehow prevented it from communicating with the union, Dean failed to explain why that mattered. Dean's communication efforts should have been with Dr. McNally or an FCE professional if they were legitimately aimed at meeting its ADA IP obligation and determining whether Rich could perform the essential functions of the operator

---

[11] The cases cited by Dean are not applicable here and if anything demonstrate Dean's dissembling and subterfuge with respect to the unnecessary HIPAA request. The HIPAA in *Keen v. Teva Sales &Mktg.* was necessary for a third-party management company hired by the employer to respond to/investigate plaintiff's reasonable accommodation/RTW request, and the plaintiff was rude, loud and argumentative with the company. Keen, 303 F. Supp. 3d at 706. In *Kennedy v. United Techs. Corp.*, the employer reasonably and within its rights requested a HIPAA release so it could communicate with plaintiff's doctor about his alleged disability and accommodation request. Kennedy, 2012 WL 3728141, *1-2, 6. Here, Dean did not request a HIPAA release so it could talk to Dr. McNally and find out, for example, how much gripping the doctor believed would be "repetitive." In fact, Dean made no effort to communicate with Dr. McNally. Such effort would have been a reasonable, good faith step to take if Dean was truly interested in complying with the ADA.

job and what accommodations may assist him. The union did not know that information. And Dean does not allege that Rich interfered with its efforts to get any information from the union. Dean fails to explain any significance to "sharing" Rich's restrictions with the union.  It's just one more Dean illogical, red herring position from which a jury can reasonably determine that it purposely and baselessly frustrated the entire process with its worthless demand for a meaningless HIPAA release and thereby "flunked" its ADA obligations.  See *Gile v. United Airlines, Inc.,* 213 F. 3rd 365, 373-74 (7th Cir. 2000) (employer did nothing to determine if any alternative accommodations would be appropriate),  Summary judgment is therefore not appropriate.

  **C. *Dean's Policies Violate the ADA.***

  As described above, the undisputed evidence shows that Dean applied a 100% healed policy to force Richard to work beyond his restrictions in October 2009. ¶¶4-11, 48-49. The evidence also shows that it is Dean's policy and practice to require that workers with restrictions from what it believes are non-work related injuries to be 100% healed in order to RTW. Id. That is illegal. It is also relevant evidence to show Dean's illegal discriminatory intent and motive for barring Rich from RTW causing the termination of his employment. Dean's November 2012 "TTD" policy which ostensibly allows workers with restrictions from what Dean believes are work-related injuries to RTW for up to 180 days, also violates the ADA when applied to remove from or keep a disabled worker out of work.  Dean unilaterally and without any effort to engage in the ADA-mandated IP removes a worker who is not 100% healed after 180 days on TTD. ¶¶48-49. A 100% healed policy constitutes a per se violation of the ADA because it "prevents individual assessment . . . [and] necessarily operates to exclude disabled people that are qualified to work." *Steffen v. Donahoe*, 680 F.3d 738, 748 (7th Cir. 2012); *Weigel v. Target Stores*, 122

F.3d 461, 466 (7th Cir. 1997) (whether plaintiff is a qualified disabled person "necessarily involves an individualized assessment of the [worker] and the relevant position.")

## <u>Conclusion</u>

Wherefore, Plaintiff, RICHARD JANKOWSKI, respectfully requests that this Court enter deny Defendants' Motion for Summary Judgment and set this matter for trial.

Respectfully submitted,
Plaintiff, RICHARD JANKOWSKI,


By:_____/s/ Timothy J. Coffey
       Timothy J. Coffey, Esq.
       THE COFFEY LAW OFFICE, P.C.
       Attorneys for RICHARD JANKOWSKI
       1805 North Mill Street, Suite E
       Naperville, IL 60563
       (630) 326-6600
       tcoffey@worker-law.com